AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Oklahoma

In the Matter of the Search of ) 
*Information Associated with Instagram Account* ) Case No. 25-mj-603-CDL
*FW_JAY2024 that is Stored at a Premises Controlled by* ) 
*Meta Platforms, Inc.* ) **FILED UNDER SEAL**
)

*FILED JUL 17 2025 Heidi D. Campbell, Clerk U.S. DISTRICT COURT*

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A." This court has authority to issue this warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).
located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251 | **Sexual Exploitation of Children** |
| 18 U.S.C. §§ 2252 | **Certain Activities Relating to Material Involving the Sexual Exploitation of Minors** |

The application is based on these facts:
**See Affidavit of Jessica Howell-Rivera attached hereto.**

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jessica Howell-Rivera, FBI
*Printed name and title*

Subscribed and sworn to by phone.

Date: July 17, 2025

_____
*Judge's signature*

City and state: Tulsa, Oklahoma

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In the Matter of the Search of Information Associated with Instagram Account FW_JAY2024 that is Stored at a Premises Controlled by Meta Platforms, Inc. | Case No. _____ <br><br> **FILED UNDER SEAL** |

### Affidavit in Support of an Application for a Search Warrant

I, Jessica Howell-Rivera, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta Platforms, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed by the FBI since December of 2022. I have been a Special Agent since April 2023. Prior to being employed by the FBI, I was employed by Texas Department of Human Services as a Child Protective Service worker for approximately four years, working to investigate child abuse and neglect. I received a Bachelor of Arts Degree with a double Major in Psychology and Sociology from Dallas Baptist University in 2009. I received a Master of Arts Degree in Counseling from Dallas Baptist University in 2011. As a Special Agent, I attended and completed the FBI Academy in 2022-2023. During this training, I received detailed academic and practical training in the areas of, but not limited to narcotics enforcement, drug identification, violent crime and gang investigations, and other law enforcement and investigative techniques. I am currently assigned to Tulsa FBI Resident Agency and work in an Indian Country Squad, where I primarily investigate violent crimes involving child sexual abuse, child physical abuse, child exploitation and the receipt, possession, advertisement, transmission, and production of child pornography and enforcement of child sexual abuse and other major crime investigations in Indian Country.

3. Through my training and experience as an FBI SA, I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence identification, child pornography identification, computer evidence seizure and processing, and various criminal laws and

procedures. I have participated in the execution of search warrants, including but not limited to the search and seizure of computer equipment, electronic devices, and the search of social media accounts.

4.  Through my training and experience as an FBI Special Agent, I have become familiar with the methods of operation used by people who sexually exploit children. I have attended training classes concerning computer crimes, enticement of minors, and the sexual exploitation of children on the Internet. This training and experience in these investigations have given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses. Additionally, I have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in numerous forms of media, including on computers and digital devices. I have participated in authorized searches, including those specifically involving investigations of the production of child pornography, distribution of child sexual assault material via peer-to-peer networks, and other violent crimes against children.

5.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement partners, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2251- Sexual

Exploitation of children (Production of child pornography) and 18 U.S.C. §§ 2252 - Certain activities relating to material involving the sexual exploitation of minors (Possessing, distribution and receipt of child pornography). Certain activities relating to material constituting or containing child pornography, have been committed by unknown subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2251- Sexual Exploitation of children (Production of child pornography) and 18 U.S.C. §§ 2252 - Certain activities relating to material involving the sexual exploitation of minors (Possessing, distribution and receipt of child pornography) have been committed and have resulted in the exploitation of J.B., that occurred at 1247 N Vandalia Ave, Tulsa, Oklahoma 74115, which lies within the Northern District of Oklahoma.

9. On or about May of 2024, MIKELLE WILSON (WILSON) searched through her 15-year-old daughter's, J.B., phone. While searching through J.B.'s phone,

WILSON discovered multiple unknown phone numbers sending J.B money through Apple Pay and Cash App. In the description of the transaction, it said "favor for favor." WILSON found multiple nude photos and videos of J.B. and videos of J.B. and a 14-year-old male, (J.S.) and J.B. participating in sexual acts. WILSON found messages of people requesting certain nude videos and pictures of J.B. and J.S. in exchange for money. WILSON discovered J.B. communicated with adult males who sent J.B. money in exchange for nude videos and images through Instagram and Snap Chat. WILSON notified Muscogee (Creek) Nation Lighthorse Police of what she discovered on J.B.'s phone.

10. On or about May 28, 2024, Muscogee (Creek) Nation Lighthorse Police were called regarding a child selling sexually explicit material. Muscogee (Creek) Nation Lighthorse Detective called WILSON regarding her report and met WILSON at 1247 N Vandalia Ave, Tulsa, Oklahoma 74115, where WILSON was temporarily residing. WILSON stated to the Muscogee (Creek) Nation Lighthorse Detective she found nude videos and pictures of J.B. and her boyfriend J.S. engaging in sexual acts. Wilson stated J.B. was selling the explicit material to adult men on social media sites. The adult men were paying J.B. through different cash forums. WILSON signed a voluntary consent to search digital device for Muscogee (Creek) Nation Lighthorse Detectives. WILSON owned the cell phone J.B. used and paid for the phone service. WILSON did not have the phone at that time and agreed to give it to detectives the following day.

11. On or about May 29, 2024, Muscogee (Creek) Nation Lighthorse Detectives met with WILSON at 4811 S Jackson, Apartment S28, Tulsa, Oklahoma 74107 and collected J.B.'s cell phone.

12. On or about May 29, 2024, Muscogee (Creek) Nation Lighthorse Detectives met with MEGAN WALKER (WALKER), the mother of J.S. WALKER stated she became aware of the situation a few days prior when WILSON told her she found videos and pictures of J.B. and J.S. participating in sex acts. WALKER confronted J.S. about the pictures and videos and J.S. was aware of the pictures and videos. J.S. told WALKER that J.B. was selling pictures before they met. J.S. told WALKER that J.B. and J.S. made a video together in which they engaged in sexually explicit conduct and sold it for approximately $100.

13. On or about May 31, 2024, I interviewed WILSON at 1247 N Vandalia Avenue, Tulsa, Oklahoma 74115. WILSON stated she searched J.B.'s phone after J.B. made suicidal statements and found multiple sexually explicit pictures and videos of J.B., and additionally found videos of J.B. and J.S. participating in sexual acts. WILSON found multiple transactions from Apple Pay and Cash App where unknown people sent J.B. money in exchange for the sexually explicit material. WILSON saw approximately $1000 in transactions sent to J.B.'s phone in approximately a 10-day span on or about May of 2024 from the unknown adults. One of the transactions said, "favor for favor." J.B's Cash App account was suspended because the account had received the maximum amount of money for the month. In the pictures, WILSON recognized J.S.'s residence (4128 S 32nd W. Ave,

Tulsa, Oklahoma 74107) and SARA SNYDER's (SNYDER) and JUSTIN JORDAN's (JORDAN) residence (2321 W 51st St., Tulsa, Oklahoma 74107) in the pictures and videos. WILSON and J.B. lived with SNYDER and JORDAN from approximately November of 2023 to approximately April of 2024. During that time J.B. told WILSON that SNYDER and JORDAN suggested to J.B. they should sell nude pictures and videos on social media to make money. SYNDER and JORDAN assisted J.B. with setting up social media platforms and taught her how to get money for selling sexually explicit material. WILSON opined J.B. began making sexually explicit material on or about February 2024. WILSON signed an FBI FD-26, consent to search the phone she allowed J.B. to use.

14. On or about June 3, 2024, FBI submitted a preservation request to Meta Platforms, Inc for Instagram. That preservation request number is 8729966 and 8723454. Instagram has preserved user ID "fw_jay2024" (Instagram account 1), and username "545190032284" as a result of this investigation.

15. On or about June 3, 2024, FBI submitted a preservation request to Meta Platforms, Inc. formally known as Facebook. That preservation request number is 8938689. Facebook has preserved user ID "61550209515665" (Facebook account 1) as a result of this investigation.

16. On or about June 3, 2024, FBI submitted a preservation request to Tiktok. That preservation request number is 17491371. Tiktok has preserved "FW_JAY2024" (Tiktok account 1), and user ID "6835108811158946821" (Tiktok account 2) as a result of this investigation.

17. On or about June 3, 2024, FBI submitted a preservation request to Snap Chat. That preservation request number is 98bd7422ea. Snap Chat has preserved "fw_jay024" (Snap Chat account 1) and username "fw_jay023" (Snap Chat account 2) as a result of this investigation.

18. On or about June 4, 2024, J.S. was forensically interviewed at the Children's Advocacy Center, located at 2829 South Sheridan Road, Tulsa, Oklahoma 74129. J.S. was in a relationship with J.B. for approximately 3 or 4 months after they met on TikTok and began chatting. J.B. and J.S. slept over at each other's houses frequently. J.S. stated J.B. "sold nudes" to males on the Internet. J.S. stated when J.B. and J.S. lived with SNYDER and JORDAN they did not have money. SNYDER and JORDAN told them "selling nudes" was a good way to make money. J.B. and J.S. began making sexually explicit videos and sold them to people online. In one "sex video" J.B. and J.S. recorded, their "private parts were touching." On a second "sex video" J.B. and J.S. recorded, J.B. participated in oral sex with J.S. The videos were saved in J.S.'s and J.B.'s phone. J.B. knew of approximately two other people over the internet that J.B. sent the explicit material to. J.S. did not know who they were. J.S. knew that J.B. sold pictures and videos on the internet because J.S. saw videos J.B. made of J.B. on J.B.'s phone that showed J.B.'s "butt and tits." J.S. saw J.B. receive multiple messages on J.B.'s phone and asked J.B. who the messages were from, and J.B. stated, "just one of those people." J.S. communicated with J.B. on TikTok, Snapchat and Instagram. J.S. stated WILSON contacted J.B. and requested J.B. send WILSON money to WILSON's CashApp.

19. On or about June 4, 2024, I met with WALKER at the Children's Advocacy Center located at 2829 S Sheridan Road, Tulsa, Oklahoma 74129. Walker signed an FBI FD-26, consent to search, for WALKER's cell phone that she allowed J.S. to use. J.S.'s cell phone number was 918-285-0435.

20. On or about June 6, 2024, I collected one cell phone that belonged to WILSON, that J.B. used, and one cell phone that belonged to WALKER that J.S. used from Muscogee (Creek) Nation Lighthorse Police Detective Leonard Lovins. These were the cell phones used to record the sex videos and conduct financial transactions.

21. On or about June 6, 2024, FBI submitted a preservation request to Cash App. That preservation request number is SQ20240606064915560QSV42. Cash App has preserved "$ssnyder0993" account and phone number 918-954-5141 as a result of this investigation.

22. On or about June 12, 2024, I interviewed JAMES BOONE, father of J.B. at his residence. WILSON told BOONE what she discovered on J.B.'s phone. BOONE often sent money for living expenses to J.B.'s's CashApp on "L0veJayC." BOONE's teenage son, MALACHI BOONE, stated J.B's 's Instagram account username was, "fw_jay2024" and J.B.'s SnapChat was, "FW_Jay1028."

23. On or about June 26, 2024, FBI extracted evidence from J.B.'s and J.S.'s 's phone.

24. On or about June 27, 2024, J.B. was forensically interviewed at the Children's Advocacy Center, located at 2829 South Sheridan Road, Tulsa, Oklahoma 74129.

J.B. lived with WILSON at SNYDER and JORDAN's residence for approximately 5 months. J.B. stated "it was really just me like selling nude and sex videos." J.B. stated WILSON found out when she went through her phone. J.B. assumed "one of them probably just text me at the time and she seen it." J.B. stated "like one of them probably texted me and was like "hey can I buy" or like "are you selling?" Just something like that." When the interviewer asked how J.B. knew the people she sold images to, J.B. stated "I don't, they're just from Instagram. Like they texted me." When the interviewer clarified if the communications were through text message or Instagram message, J.B. stated "Instagram message." J.B. stated "They would text and ask, I'd tell them to send money first, they would send the money, I'd send a video, and then they'd send the rest of the money, and then that was it." J.B. stated she did not know these people in real life. The interviewer asked J.B. how the people that purchased the videos and pictures found J.B. and J.B. stated "I don't know. I know, it could've been from like, cuz I have over a thousand followers on Instagram." J.B. stated J.B.'s username on Instagram was "fw_jay2024" J.B. stated "They would ask for videos like, I'd be like "what do you want to buy?" And they'd be like, this, this or that, like stripping videos, sex videos or like, just stuff like that, and I'd be like, "okay."" J.B. stated "I'd tell 'em to send the money first, or half of the money, and then they would—they would either send it to my CashApp or Apple Pay. And then after they did that, I'd send the video and then they'd send the rest of the money." When the interviewer asked J.B. how they knew how much money they were supposed to send, J.B. stated "it just depended on the video, like,

that's what I based the price off of. Like, if, say a sex video was like, $50, I'd make them send like $25 and then $25 after." J.B. stated J.B. decided the price. The interviewer asked J.B. to provide examples of what different things cost, J.B. stated, "Like, a bundle—like a sex video, a stripping video and like a blowjob video would be like $145 for all three. And then they'd buy all three." J.B. made the videos with J.S. or by J.B.'s self. J.B.'s Cash App username was, "L0vejayc." J.B.'s Apple Pay was connected to J.B.'s phone number. J.B. additionally used iMessage or a regular text message. J.B. stated, "well they would text me on Instagram and then give their numbers, and then we'd move over apps." J.B. stated, "Instagram, TikTok, Snapchat, Twitter, Facebook, Messenger. J.B.'s TikTok account name is, "fw_jay2024." J.B.'s Snap chat name is, "fw_jay1028." J.B. stated, "I've had a dude try to meet up with me before, like, for a pair of shoes and I was like, no." J.B. stated, "I know they figured out who it was, cuz he lives in Tulsa or Owasso. And he was just like, "if you have sex with me, I'll give you these new Jordans." And I was like "I'm not a prostitute" like that or like "I'm not gonna go have sex with somebody for something." I was like, "I'm not that low, I'm not doing that."" and then I unadded him for that and then he would text my number and I think... he would always send me money to unblock him and I would, I would unblock him and then block him again. I don't know, but that's it." When the interviewer asked J.B. if there was ever a time J.B. told them how old J.B. was, J.B. stated a long time ago, "he was texting me, tryna buy, and me and him started arguing and I was like, you're the one buying from a fifteen-year-old, don't try talking to me like that. And

then, he was like, 'you're the one selling.'" When the interviewer asked J.B. how J.B. got started selling pictures and videos, J.B. stated, "The people we used to live with, Sarah and JJ, kinda like influenced that it would be a good idea to do. Cuz like Sarah also took me to buy lingerie from Victoria Secrets. Like they just influenced me and Jordan to do it." When the interviewer asked J.B. did Sarah and JJ ever ask for money, J.B. stated, "like, I think they've asked for money before, but we would always be like, no."

25. On or about September 4, 2024, two phone extraction reviews were completed by FBI Intelligence Analyst Kaela McCarthy. The phone extractions revealed J.B. communicated with approximately 143 people through Instagram, Tiktok, Snapchat, Facebook Messenger, and text messages. In the messages there were multiple chat conversations where unknown adults were soliciting J.B. to send sexually explicit videos and pictures in exchange for money. There were multiple conversations discussing what types of sexually explicit videos or pictures the unknown adults wanted and how much J.B. charged for the discussed sexually explicit material. The phone extraction revealed multiple transactions made through Cash App and Apple Pay by the people in exchange for the sexually explicit material. The phone extraction revealed hundreds of nude images and sexually explicit videos of J.B., as well as videos of J.B. engaging in sex acts with multiple males. The exact age of the males in the videos could not be determined. It appeared the explicit material was captured by J.B. on J.B.'s cell phone. J.S.'s phone extraction revealed approximately 2 sexually explicit videos of J.B. and J.S.

26. On or about October 10, 2024, I received the Grand Jury Subpoena from United States District Court for the Northern District of Oklahoma for Block Inc. (CashApp) and Green Dot Bank (Apply Pay) for J.B's accounts.  J.B's Cash App had subject lines that stated, "anal," "butt stuff," "butt sex," and "school supplies."

27. On or about October 11, 2024, I served the Grand Jury Subpoena's to Block Inc. and Green Dot Bank.

28. On or about November 4, 2024, I received Grand Jury Subpoena returns from Block Inc. and Green Dot Bank. The Grand Jury Subpoenas for Block Inc. and Green Dot Bank for J.B.'s accounts revealed multiple transactions from different people. This information included some of the same people or accounts soliciting J.B. for sexually explicit material found on J.B.'s phone extraction.

29. At this time, I cannot determine the exact time when J.B. began communicating about the sale of sexually explicit material to multiple people. Based on the facts presented, those conversations occurred through Instagram. Obtaining J.B.'s Instagram records for the year and a half preceding the discovery of this information (December 1, 2023- July 16, 2025) would be sufficient to assist in the investigation. Finally, obtaining J.B.'s Instagram records through the present would assist me in determining additional information for multiple unknown subjects who solicited minors for sexually explicit videos and pictures in exchange for money. This information would assist in determining the account holder's current whereabouts, which would aid in the investigation.

## BACKGROUND CONCERNING INSTAGRAM[1]

30. Instagram is a service owned by Meta Platforms, Inc., a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

31. Meta Platforms, Inc. collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Facebook keeps records of changes made to this information.

32. Meta Platforms, Inc. also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and

---

[1] The information in this section is based on my training and experience, and on information published by Facebook on its website and its Instagram website, including, but not limited to, the following webpages: "Data Policy," available at https://help.instagram.com/519522125107875; "Information for Law Enforcement," available at https://help.instagram.com/494561080557017; and "Help Center," available at https://help.instagram.com.

other information about devices and web browsers used to access an account, and session times and durations.

33. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

34. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Meta Platforms, Inc. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service. Meta Platforms, Inc. maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

35. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain

activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

36. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta Platforms, Inc. to access the contact lists on their devices to identify which contacts are Instagram users. Meta Platforms, Inc. retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Facebook to search an associated Meta Platforms, Inc. for friends who are also Instagram users. Users can also manually search for friends or associates.

37. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

38. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta Platforms, Inc.

39. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

40. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Facebook's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

41. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

42. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders

can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

43. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

44. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Facebook retains records of a user's search history and followed hashtags.

45. Facebook collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta Platforms, Inc. to personalize and target advertisements.

46. Meta Platforms, Inc. uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta Platforms, Inc. maintains related records for Instagram users, including information about their

perceived ad topic references, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

47. In some cases, Instagram users may communicate directly with Meta Platforms, Inc. about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta Platforms, Inc. typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48. For each Instagram user, Meta Platforms, Inc. collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

49. In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

50. Based on my training and experience, stored data, such as instant messages, emails, photos, videos, and documents, are often created and used in furtherance of

criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation and can also lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

51. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Facebook can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time, may be evidence of who used or controlled the account at a relevant time, and device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

52. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

53. Other information connected to the use of an account may lead to the discovery of additional evidence. For example, accounts are often assigned or associated with additional identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities. This information may help establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

54. Therefore, Meta Platforms, Inc.'s servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users. Specifically, information obtained from J.B.'s Instagram account is crucial to the ongoing investigation into the sexual exploitation of J.B. and J.S. That information could assist in identifying all of the people who have communicated with J.B.'s Instagram and purchased sexually explicit material. In addition to identification, Meta Platforms, Inc.'s records, both past and present, could help determine a pattern of life for the person who J.B. communicated with on Instagram, which could assist in locating those people. Finally, based on J.B.'s use of Instagram to facilitate its interactions with multiple unknown adults, it is likely that J.B. utilizes Instagram for day-to-day interactions, including, potentially, being solicited to produce sexually explicit videos and pictures in exchange for money.

## CONCLUSION

55. Based on the foregoing, I request that the Court issue the proposed search warrant.

56. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta Platforms, Inc.'s for Instagram. Because the warrant will be served on Meta Platforms, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

57. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is not public. Disclosure could provoke the destruction of evidence or the flight of the unknown subjects. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

58. I finally request that notice of this search warrant be delayed not more than 30 days. Delay of notification is authorized is the Court finds reasonable cause to believe that immediate notification of the execution of the warrant may have an adverse result. 18 U.S.C. § 3103a(b)(1). Adverse results include flight from prosecution, destruction of or tampering with evidence, and otherwise seriously jeopardizing an investigation. 18 U.S.C. § 2705(a)(2)(B), (C), (E). As outlined in

paragraph 47 of this Affidavit, I believe reasonable cause exists to find all three of these adverse results could occur if immediate notification is required.

Respectfully submitted,

Jessica Howell-Rivera
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by phone this 17th day of July, 2025.

CHRISTINE D. LITTLE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the Instagram account "fw_jay2024" and located at https://www.instagram.com/fw_jay2024, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.     **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2.     All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from [December 1, 2023 to July 16, 2025].

7. Privacy and account settings, including change history; and

8. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B. All content (whether created, uploaded, or shared by or with the Account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from [December 1, 2023 to July 16, 2025];

C. All content, records, and other information relating to communications sent from or received by the Account from [December 1, 2023 to July 16, 2025], including but not limited to:

1.  The content of all communications sent from or received by the Account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.  All records and other information about direct, group, and disappearing messages sent from or received by the Account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.  All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.  All associated logs and metadata;

D. All content, records, and other information relating to all other interactions between the Account and other Instagram users from [December 1, 2023 to July 16, 2025], including but not limited to:

1.  Interactions by other Instagram users with the Account or its content, including posts, comments, likes, tags, follows (including unfollows,

approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3. All contacts and related sync information; and

4. All associated logs and metadata;

E. All records of searches performed by the account from [December 1, 2023 to July 16, 2025]; and

F. All location information, including location history, login activity, information geotags, and related metadata from [December 1, 2023 to July 16, 2025].

Meta is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

**II.    Information to be searched for and seized by the government**

All information described above in Section I that constitutes [evidence, instrumentalities, contraband, and/or fruits] of violations of [18 U.S.C. §§ 2251-Sexual Exploitation of children (Production of child pornography) an 18 U.S.C. §§ 2252 -Certain activities relating to material involving the sexual exploitation of

minors (Possessing, distribution and receipt of child pornography)], including, for each account or identifier listed on Attachment A:

A. Information pertaining to the sexual exploitation of minor victim J.B. and J.S. and other possible unknown minor victims. To include pertinent communication and exchanges of images and videos between conspirators and minor victims. Information pertaining to evidence of soliciting children for child pornography in exchange for money, child exploitation, possessing, distributing and receipt of child pornography.

B. Communications between the Instagram account and others from [December 1, 2023 to July 16, 2025];

C. Evidence indicating the times, geographic locations, and electronic devices from which the Instagram account listed in Attachment A was accessed and used, to determine the chronological and geographical context of the Instagram account access, use, and events relating to the crime under investigation and to the Instagram account user.

D. Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation.

E. The identity of the person(s) who created or used the Instagram account, including records that help reveal the whereabouts of such person(s).

F. The identity of the person(s) who communicated with the Instagram account about matters relating to the crime under investigation.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**Certificate of Authenticity of Domestic Records Pursuant to Federal Rules of Evidence 902(11) and 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc., ("Meta") and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]** associated with the Instagram account "fw_jay2024" and located at https://www.instagram.com/fw_jay2024.
I further state that:

A. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

B. Such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

    1.    The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

    2.    The process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____    _____

Date                      Signature